UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

THOMAS M. PROBST,                    )
                                     )
              Plaintiff,             )
                                     )
         v.                          )        Case No. 4:12CV439 AGF
                                     )                        (FRB)
CAROLYN W. COLVIN, Acting            )
Commissioner of Social Security,[1]  )
                                     )
              Defendant.             )


**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

     This cause is before the Court on plaintiff's appeal of

an adverse determination by the Social Security Administration.

All pretrial matters were referred to the undersigned United States

Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate

disposition.

**I.  Procedural History**

     On February 16, 2010, the Social Security Administration

denied plaintiff Thomas M. Probst's November 2, 2009, application

for Disability Insurance Benefits filed pursuant to Title II of the

Social Security Act, 42 U.S.C. §§ 401, et seq., in which he claimed

he became disabled on February 2, 2009.  (Tr. 44, 48-52, 99-105.)

At plaintiff's request, a hearing was held before an Administrative

_____

     [1]On February 14, 2013, Carolyn W. Colvin became the Acting
Commissioner of Social Security.  Pursuant to Fed. R. Civ. P.
25(d), Carolyn W. Colvin is therefore automatically substituted
for former Commissioner Michael J. Astrue as defendant in this
cause of action.

Law Judge (ALJ) on September 14, 2010, at which plaintiff and a vocational expert testified. (Tr. 24-43.) On October 25, 2010, the ALJ denied plaintiff's claim for benefits finding plaintiff able to perform his past relevant work as a small products assembler. (Tr. 9-20.) On February 9, 2012, upon review of additional evidence, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-4.) The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

Plaintiff now seeks judicial review of the Commissioner's final decision arguing that it is not based upon substantial evidence on the record as a whole. Specifically, plaintiff claims that newly submitted evidence before the Appeals Council shows plaintiff's mental impairment to be severe, and thus that the ALJ's determination that plaintiff did not have a severe mental impairment was not supported by substantial evidence. Plaintiff claims that, as a result, the ALJ's determination as to plaintiff's residual functional capacity (RFC) was likewise not supported by substantial evidence inasmuch as it failed to consider the effects of plaintiff's severe mental impairment. In addition, plaintiff claims that no medical opinion evidence supports the ALJ's determination as to plaintiff's physical RFC. Plaintiff contends that the ALJ's flawed RFC determination resulted in a flawed hypothetical question being posed to the vocational expert.

Finally, plaintiff argues that the ALJ failed to undergo the required function-by-function analysis in determining plaintiff able to perform his past relevant work.

## II. Testimonial Evidence Before the ALJ

A.  <u>Plaintiff's Testimony</u>

At the hearing on September 14, 2010, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was forty-eight years of age. Plaintiff was a high school graduate. (Tr. 26.)

From July 1992 to December 2008, plaintiff worked at LMC Industrial in shipping and receiving, and in machine operations/ assembly. (Tr. 175.) Plaintiff testified that he assembled seat belts. Plaintiff testified that he lifted no more than ten pounds during such work and that he sat approximately four hours and stood and/or walked approximately four hours in an eight-hour workday. Plaintiff testified that he was able to switch positions throughout the day. Plaintiff testified that a fair amount of bench assembly work was involved with the job. (Tr. 26-27.)

Plaintiff testified that his employment ended in February 2009 when his job was discontinued and he could not perform the physical requirements of other work at the facility. Plaintiff testified that he applied for unemployment benefits upon the termination of his work and received such benefits until one month prior to the hearing. Plaintiff testified that he could probably

continue working in his previous position as he performed it, if the job had not been eliminated. (Tr. 28-29.)

Plaintiff testified that he has had stabbing and shooting back pain for approximately fourteen years as a result of a workplace incident. (Tr. 29.) Plaintiff testified that he had CT scans and MRI's at the time of his injury, but had no recent diagnostic tests. Plaintiff testified that an MRI taken in 2002 showed impingement of a nerve root in the lower back, and that he currently experienced pain at the same level. (Tr. 32-33.) Plaintiff testified that he took medication and underwent therapy at the time of the injury, but that surgery was not recommended because of no guarantee of improvement. (Tr. 31.)

Plaintiff testified that he also currently has problems with a disc in his neck that causes numbness and his muscles to freeze. (Tr. 32.) Plaintiff testified that he experiences muscle spasms multiple times on a daily basis which cause him to stop whatever he is doing anywhere from half an hour to all day. (Tr. 33-34.)

Plaintiff testified that an EMG taken in 2006 showed nerve damage in both upper extremities which causes difficulties with gripping and fine manipulation. Plaintiff testified that he is wary of performing household chores that require climbing ladders because of his inability to grip things. Plaintiff testified that he also has pain and numbness in his upper

extremities that travel from the back of his neck to his head and face. Plaintiff testified that he fears he is having a stroke during such episodes. (Tr. 35-36.)

Plaintiff testified that he takes Gabapentin for pain, Baclofen for muscle spasms, and the anti-depressant Nortriptyline for sleep. (Tr. 33.) Plaintiff testified that his sleeping difficulties require him to lie down for two or three hours every day. (Tr. 37-38.) Plaintiff testified that the medications slow him down and cause difficulties with concentration and coordination. (Tr. 34-35.)

Plaintiff testified that he has asthma and chronic obstructive pulmonary disease (COPD) for which he has used an Albuterol bronchial inhaler for approximately three or four months. Plaintiff testified that he uses the inhaler three or four times a day for shortness of breath. (Tr. 30-31.) Plaintiff testified that he currently smokes one-half pack of cigarettes a day and has smoked up to one pack a day in the past. Plaintiff testified that he was currently trying to quit smoking. (Tr. 29-30.)

Plaintiff testified that he suffers from depression which completely limits him. Plaintiff testified that he cries a couple of times every day for fifteen minutes to half an hour. Plaintiff testified that he has had suicidal thoughts, sometimes on a daily basis, wishing that he would not wake up the following day. (Tr. 36-37.)

Plaintiff testified that he can care for his personal needs. (Tr. 37.)

B. <u>Testimony of Vocational Expert</u>

Dr. John McGowan, a vocational expert, testified in response to questions posed by the ALJ and counsel.

The ALJ asked Dr. McGowan to consider an individual of plaintiff's age, education, work experience, and alleged date of disability onset. The ALJ asked Dr. McGowan to further assume that the individual

> is able to carry 20 pounds occasionally, 10 pounds frequently, stand or walk for at least six hours a day, sit for at least six hours a day, can occasionally climb stairs and ramps, never ropes, ladders, and scaffolds, occasionally stoop, kneel, crouch, and crawl, should avoid concentrated exposure to fumes, odors, dust, and gases, hazards of unprotected heights and vibration.

(Tr. 38-39.)

Dr. McGowan testified that such a person could perform plaintiff's past relevant work in small parts assembly, which is performed at the light level as described in the Dictionary of Occupational Titles (DOT). (Tr. 39.)

The ALJ then asked Dr. McGowan to consider the same individual, except that such a person was limited to carrying "10 pounds occasionally, less than 10 pounds frequently, stand or walk up to two hours out of eight, sit for six[. E]verything else stays

the same." (Tr. 39.) Dr. McGowan testified that such a person could perform plaintiff's past relevant work as he actually performed it, but not as customarily performed in the national economy because of the weight limit. (Tr. 39-40.) Dr. McGowan testified that such a person could also perform sedentary work as a service board assembler, of which 5,000 such jobs exist in the State of Missouri and 422,900 nationally; and as a final assembler of optical goods, of which 1,160 jobs exist in the State of Missouri and 68,600 nationally. (Tr. 40-41.)

Plaintiff's counsel then asked Dr. McGowan whether his answer would change if the person described in the second hypothetical was limited to fine fingering, handling and grasping on a less-than-occasional basis, to which Dr. McGowan testified that his answer would change inasmuch as the work he described required frequent or continual use. Counsel then asked Dr. McGowan to assume that the individual would have to take unscheduled breaks up to half an hour at a time due to pain or depressive symptoms. Dr. McGowan testified that such a person could not perform the jobs previously described. (Tr. 41-42.)

### III. Medical Evidence Before the ALJ

A chest x-ray taken October 7, 2008, in relation to plaintiff's COPD showed no acute pulmonary infiltrate. (Tr. 198.) A CT scan of the abdomen taken that same date yielded normal results. (Tr. 197.)

Plaintiff visited chiropractor Dr. Richard Planzo of Albanna Neurosurgical Consults on April 17, 2008, with complaints of neck discomfort, aching muscle spasms in the neck and shoulder, and stiffness in the neck. Plaintiff reported that lifting and increased activity worsened the condition, and that the condition worsened toward the end of the day. Physical examination showed paraspinal muscle hypertonicity/spasm and tenderness about the left and right rib cages and about the cervical spine. Plaintiff had decreased range of motion about the cervical spine. Sensory, motor and reflex examination was unremarkable. Dr. Planzo diagnosed plaintiff as having an acute exacerbation of a chronic condition. An adjustment to the cervical and thoracic spines was administered, with ultrasound and myofascial release. Plaintiff reported decreased pain and was instructed to advance his activities as tolerated. (Tr. 208.)

Plaintiff returned to Dr. Planzo on May 8, 2008, and reported continued neck discomfort with spasms, stiffness and numbness. Plaintiff reported the symptoms to have come on the previous day and that they worsened with increased activity. Physical examination showed paraspinal muscle hypertonicity/spasm and tenderness about the left rib cage and cervical spine. Range of motion about the cervical spine was decreased. An adjustment was performed with myofascial release and ultrasound. Plaintiff reported decreased pain. (Tr. 207.)

Plaintiff returned to Dr. Planzo on October 30, 2008, and complained of muscle spasms in his neck and shoulder, and numbness and tingling in his left arm. Plaintiff reported the condition to have come on one week prior and that the pain was severe. Plaintiff also complained of low back pain with aching and soreness with range of motion. Plaintiff reported that bending and standing worsened his back pain. Physical examination showed paraspinal muscle hypertonicity/spasm and tenderness about the lumbar spine, right pelvis, cervical spine, and left and right rib cages with decreased range of motion about the cervical and lumbar spines. Sensory, motor and reflex examination was unremarkable. Dr. Planzo diagnosed plaintiff with cervical radiculopathy, myofascial syndrome and joint instability. An adjustment was administered to the right pelvis, cervical spine and lumbar spine, with decreased pain and improved range of motion noted. Ultrasound and myofascial release was also performed. Plaintiff was instructed to advance in activities as tolerated and to return as needed. (Tr. 205.)

On January 30, 2009, plaintiff visited Dr. Planzo with complaints of neck discomfort with aching muscle spasms in his neck and shoulder, and neck stiffness. Plaintiff reported the onset of such discomfort to have occurred one week prior, but that the pain was improving. Plaintiff reported the condition to have come on after long hours at work and that the condition worsened with lifting and increased activity. Plaintiff reported that he also

had numbness in his arms and swelling in his hands, but that those conditions subsided after about two hours. Physical examination showed plaintiff not to be in acute distress. Paraspinal muscle hypertonicity/spasm was noted about the cervical spine, as well as restricted motion and tenderness. Sensory, motor and reflex examination was unremarkable. Dr. Planzo diagnosed plaintiff with cervical neuritis, cervical segmental/somatic dysfunction, and myofascial syndrome. An adjustment to the cervical and thoracic spines was administered, with myofascial release and ultrasound. Plaintiff was to advance his activities as tolerated. (Tr. 204.)

On July 1, 2009, plaintiff visited Dr. Planzo with complaints of neck discomfort, muscle spasms in his neck and shoulder, and neck stiffness. Plaintiff reported having the condition for two days. It was noted that plaintiff was uncomfortable. Physical examination showed paraspinal muscle hypertonicity/spasm and tenderness about the cervical spine. Plaintiff had decreased range of motion about the cervical spine. Sensory, motor and reflex examination was unremarkable. X-rays taken of the cervical spine that same date yielded normal results. An adjustment of the cervical and thoracic spines was administered, and massage and ultrasound was applied. Plaintiff was instructed to advance his activities as tolerated and was to return for further treatment as needed. (Tr. 203.)

Plaintiff appeared at South County Health Center on

August 3, 2009, for a physical.  Plaintiff complained of having had chronic back pain for fourteen years.  Plaintiff reported the pain to be shooting and stabbing, radiating from the lumbar area to the right leg.  Plaintiff reported the pain to be relieved with lying down and with ice.  Plaintiff reported that he had seen many doctors and had taken many pain medications and muscle relaxants. Plaintiff reported being out of work for seven months.  Mental status examination was unremarkable.  Physical examination showed very tight hamstrings and decreased strength diffusely in the lower extremities, bilaterally.  Dr. Kyra A. Cass diagnosed plaintiff with lumbosacral neuritis and prescribed Gabapentin[2] and Baclofen.[3] Plaintiff was instructed to undergo daily quad strengthening and hamstring stretching.  Plaintiff was also diagnosed with carpal tunnel syndrome, based on an EMG taken in 2006, and was prescribed wrist splints for overnight use.  Plaintiff was also diagnosed with cervical neuralgia/neuritis.  Plaintiff was advised to quit smoking, but plaintiff indicated that he was not ready to quit after smoking for thirty years.  (Tr. 192-93.)

　　　　Plaintiff returned to Dr. Cass on September 1, 2009, and

---

[2]Gabapentin (Neurontin) is used to relieve the pain of post-herpetic neuralgia.  Medline Plus (last revised July 15, 2011) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html>.

[3]Baclofen is used to decrease the number and severity of muscle spasms caused by multiple sclerosis or spinal cord disease.  Medline Plus (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682530.html>.

reported that Baclofen was not working. It was noted that plaintiff could not take Baclofen if he would be driving. It was also noted that plaintiff had not yet used the wrist splints. Mental status examination was unremarkable. There was no change from the previous physical examination. Plaintiff reported no improvement in his pain. Recurrent muscle spasms were noted. Dr. Cass instructed plaintiff to increase his dosage of Baclofen. Dr. Cass continued in her diagnoses of lumbosacral neuritis and neuralgia/neuritis, not otherwise specified. Plaintiff was instructed to stretch daily and to apply heat as needed. (Tr. 189-90.)

Plaintiff returned to Dr. Cass on October 13, 2009, and reported that he had no back pain and that Baclofen was effective. It was noted that plaintiff continued to have muscle spasms on a daily basis and reported that they worsened at bedtime. Plaintiff also reported having quick, stabbing symptoms in his low back and left foot. Plaintiff reported having intermittent hand weakness. Physical examination was unchanged. Plaintiff was instructed to increase his dosage of Baclofen, but not to take the medication if driving. Plaintiff was instructed to continue with Gabapentin and to take ibuprofen when needed. A chest x-ray and laboratory testing were ordered. (Tr. 186-87.)

Plaintiff returned to Dr. Cass on December 15, 2009, and reported continued stabbing symptoms in variable places such as his

low back and left foot and sometimes his right shoulder. Plaintiff reported his pain to be at a level five out of ten. Plaintiff also reported intermittent hand weakness. Plaintiff reported that Baclofen was effective. Dr. Cass continued in her diagnosis of neuralgia/neuritis and instructed plaintiff to increase his dosage of Gabapentin due to muscle spasms. Plaintiff was also instructed to continue with Baclofen and ibuprofen. Plaintiff was also continued in his diagnosis of lumbosacral neuritis and was instructed to use a TENS unit and to continue with his medication. Plaintiff was referred to a pain specialist for both conditions. Given plaintiff's recent diagnosis of COPD, plaintiff indicated some contemplation about quitting smoking. (Tr. 222-23.) Thereafter, on December 17, 2009, plaintiff received instruction as to smoking cessation. It was noted that plaintiff had no symptoms of COPD yet, but wanted to quit smoking due to his health. (Tr. 221.)

On January 4, 2010, plaintiff underwent a consultative examination for disability determinations with Dr. Charles Mannis. Plaintiff reported his chief complaints to be back pain, neck pain and carpal tunnel syndrome. Plaintiff reported that he had experienced back pain intermittently for approximately fifteen years, with no specific injury noted. Plaintiff reported the pain to be constant with radiation to both legs and intermittent numbness. Plaintiff also reported muscle spasms that radiated to

his chest, causing his jaw to clench. Plaintiff reported that he had broken several teeth because of these spasms. Plaintiff reported the pain to be aggravated with most activities, but particularly with bending. Plaintiff reported that he could walk about one block, sit or stand about thirty minutes, and lift about ten pounds. Plaintiff reported having had acupuncture, chiropractic and physical therapy, and injections, but that such procedures provided only limited relief. Plaintiff reported that he currently took medications for pain and wore braces on both hands for carpal tunnel syndrome. Dr. Mannis noted that plaintiff was able to dress and undress without assistance and was able to rise from a chair and from the examination table without assistance. Plaintiff was noted to have a relatively stiff gait pattern but no limp, and he could tandem walk reasonably well. Plaintiff could walk a short degree on his toes. Tenderness to palpation was noted along the lumbar region and inter-scapular region. Plaintiff had limited range of motion about the cervical spine, both shoulders, lumbar spine, and both hips. Plaintiff had full range of motion about the elbows, wrists and hands, but decreased grip strength was noted. Sensory examination was diffusely diminished in the upper extremities. Straight leg raising was positive on the right. Dr. Mannis noted plaintiff's efforts during range of motion examination to be fair. Dr. Mannis diagnosed plaintiff with lumbar syndrome with possible

radiculopathy, cervical syndrome with possible radiculopathy, and carpal tunnel syndrome by history. Dr. Mannis noted that plaintiff's "subjective complaints were disproportionate to the lack of objective clinical findings." (Tr. 209-13.)

Plaintiff visited pain specialist Dr. William Feldner on January 14, 2010. Plaintiff reported that he has had various, recurrent and intermittent pain for years and described such pain as severe, dull, aching, sharp, stabbing, cramping, and burning. Plaintiff reported that he experienced such pain over his entire body. Plaintiff reported the pain to be at a level three or four on good days, at a level eight on bad days, with an average day at a level five. Plaintiff reported having seen numerous specialists for the pain. Neurological examination was normal, with normal reflex, sensory and motor examination. Musculoskeletal examination showed generalized muscle tenderness and local muscle tenderness with no joint swelling or joint erythema. Mild and generalized tenderness was noted about the lumbosacral spine. Examination as to range of motion was limited due to guarding and pain. Straight leg raising was negative, but tightness and pain was noted. Dr. Feldner diagnosed plaintiff with lumbosacral neuritis and muscle spasm, and instructed plaintiff to continue to use the TENS unit and to continue to use Baclofen, Gabapentin and ibuprofen. Daily stretching and application of heat was also advised. Plaintiff was instructed to return as needed. (Tr. 218-19.) Dr. Feldner noted

that he did not have "much to offer this patient. I don't feel additional imaging at this time would be very helpful. He needs to [continue] with home exercise. [Continue] present [treatments.] Chiro seems to help and he may [continue] this. His complaint[s] are more generalized than anything very specific." (Tr. 218.)

Plaintiff returned to Dr. Cass on February 16, 2010, and reported that he had intermittent positional pain in his left shoulder that he had been experiencing for weeks. Plaintiff described the pain as mild to moderate. Examination of the shoulder showed no tenderness, pain or swelling with normal strength and tone. Plaintiff exhibited pain with range of motion testing. Dr. Cass diagnosed plaintiff with possible bursitis and instructed plaintiff to rest, apply ice and take ibuprofen. Plaintiff was instructed not to engage in overhead work. It was noted that physical therapy would be helpful but was unaffordable. Plaintiff was also continued in his diagnosis of lumbosacral neuritis, and his prescriptions for Baclofen, Gabapentin and ibuprofen were refilled. Plaintiff was instructed to return in three months. (Tr. 240.)

Plaintiff visited Dr. Cass on March 30, 2010, and complained of generalized body pain. Plaintiff reported that standing up to three hours increased his pain which radiated from his back to his feet. Plaintiff reported that he was stretching regularly. It was noted that plaintiff was also following up

regarding his COPD and was contemplative about quitting smoking. It was noted that plaintiff had reduced his smoking. Plaintiff reported that he had difficulty breathing on exertion, but could climb a flight of stairs. Plaintiff was noted to be cooperative and not anxious. Physical examination showed plaintiff's gait to be stiff. Otherwise, examination was normal. It was noted that plaintiff spent time watching television. Dr. Cass instructed plaintiff to consider vocational rehabilitation, noting that plaintiff would have to be able to change positions. Nortriptyline[4] was added to plaintiff's medication regimen for neuralgia/neuritis. An EKG and pulmonary function testing (PFT) were ordered, as well as laboratory testing. (Tr. 237-38.)

The results of PFT testing performed on March 30, 2010, showed mild obstruction with significant response post-bronchodilator. (Tr. 238.)

On April 15, 2010, Dr. Cass prescribed Albuterol inhaler[5] for plaintiff. (Tr. 236.)

Plaintiff visited Dr. Cass on May 14, 2010, and reported complaints associated with pharyngitis. No other complaints were

---

[4]Nortriptyline is used to treat depression but is also prescribed to treat post-herpetic neuralgia and to help people stop smoking. <u>Medline Plus</u> (last reviewed Sept. 1, 2010)<http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a682620.html>.

[5]Albuterol (Proventil) is used to treat wheezing, difficulty breathing, chest tightness, and coughing caused by COPD. <u>Medline Plus</u> (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a607004.html>>

noted.  Physical examination showed full range of motion in all joints, with normal joints and muscles.  Plaintiff's gait and station were noted to be normal, with no spasticity, tremors or atrophy.  An antibiotic was prescribed for pharyngitis. (Tr. 231-32.)

Plaintiff returned to Dr. Cass on June 30, 2010, and complained of generalized body pain.  Plaintiff reported experiencing such variable pain intermittently for years. Plaintiff reported seeing numerous specialists and that he most recently saw a chiropractor/physical therapist.  Plaintiff reported that his sleep was better with Nortriptyline and that he felt better rested.  Plaintiff was noted to be cooperative and not anxious.  With respect to his COPD, plaintiff reported that he had not used his Albuterol inhaler and that he experienced no symptoms after taking a deep breath.  Plaintiff reported having breathing difficulty on exertion, but that he could climb a flight of stairs. Vague numbness was also reported.  Physical examination showed plaintiff's gait to look stiff but not uncomfortable.  Otherwise, examination was unremarkable.  Dr. Cass instructed plaintiff to use his inhaler to lessen his breathing difficulties on exertion. Plaintiff was also encouraged to engage in more activity.  With respect to plaintiff's neuritis/neuralgia, plaintiff was instructed to increase his Nortriptyline for better sleep and to increase his daily activity.  Plaintiff was instructed to continue use of the

TENS unit and to continue with Baclofen, Gabapentin and ibuprofen. (Tr. 229-30.)

## IV. Evidence Submitted to the Appeals Council[6]

Plaintiff visited St. Louis ConnectCare on August 19, 2010, for follow up relating to a skin condition on his right wrist. Plaintiff was noted to be in no pain and in no acute distress. Plaintiff was scheduled to return in two weeks. (Tr. 294.)

Plaintiff visited Dr. Cass on September 10, 2010, and complained of having acute, moderate numbness in his left ankle and on the left side of his face for two days. Plaintiff also reported feeling tired and weak. Plaintiff was instructed to go the emergency room, but plaintiff expressed hesitation due to cost.

---

[6]In its Notice of Action, the Appeals Council informed plaintiff that, in making its determination to deny review of the ALJ's decision, it had considered additional evidence which was not before the ALJ. (Tr. 1-4.) The Court must consider this additional evidence in determining whether the ALJ's decision was supported by substantial evidence. Davidson v. Astrue, 501 F.3d 989-90 (8th Cir. 2007). Here, the Appeals Council specifically informed plaintiff that it considered evidence designated as Exhibit 7F in the administrative file and described such exhibit as containing records from Jewish Family & Children's Services dated November 2, 2010, to February 21, 2011. (See Tr. 4.) A review of the administrative file shows, however, that Exhibit 7F also contains medical records from St. Louis ConnectCare dated August 19, 2010 (see Tr. 294); and from South County Health Center dated September 10, 2010, to January 11, 2011 (see Tr. 278-90). Inasmuch as the Appeals Council stated that it considered the evidence contained in Exhibit 7F, and records from St. Louis ConnectCare and from South County Health Center are contained in such exhibit, it is reasonable to conclude that the Appeals Council considered these records despite its failure to specifically identify them as additional evidence.

(Tr. 290.)

During follow up examination on September 30, 2010, plaintiff reported to Dr. Cass that he did not go to the emergency room, but that the symptoms resolved after one or two days. Plaintiff reported that he currently had a rapid heartbeat and was experiencing anxiety around crowds. It was noted that plaintiff had not used Albuterol recently. Plaintiff reported that he has had panic attacks for years and that they had been increasing. Plaintiff reported that he avoids people and has become a recluse. Plaintiff also reported depression, insomnia, suicidal ideation, and frequent crying. Physical examination was unremarkable. Neuropsychiatric examination showed plaintiff's mood and affect to be depressed. Plaintiff was instructed to continue with Gabapentin and Nortriptyline. Proventil inhaler was prescribed. Plaintiff was also diagnosed with depressive disorder with social phobia, anxiety and depressive symptoms. Plaintiff was referred to psychiatry. (Tr. 288-89, 290.)

Plaintiff visited Robin Hinshaw, MSW, LCSW, on October 4, 2010, for the purpose of obtaining a psychiatry referral. Plaintiff reported being depressed and anxious for quite a while and that he kept himself isolated. Plaintiff reported being in a lot of physical pain and that he recently had a cancerous growth removed from his arm. Plaintiff was referred to the psychiatry program at Jewish Family Services and was encouraged to think about

counseling.  (Tr. 286.)

Plaintiff returned to Dr. Cass on October 29, 2010, and reported that he was sleeping better with a higher dose of Nortriptyline.  Plaintiff reported his pain to be "okay" during the first few hours of the day.  Plaintiff's medications were noted to include ibuprofen, Baclofen, Gabapentin, and Nortriptyline. Plaintiff also reported some, but little, improvement in his anxiety with Nortriptyline.  Physical examination showed stiff, tight muscles.  There were no signs or symptoms of rheumatoid arthritis.  Plaintiff was prescribed Nortriptyline, Baclofen and Piroxicam.[7]  With respect to plaintiff's depressive disorder, it was noted that plaintiff was scheduled to see a psychiatrist the following month.  Plaintiff was referred to a dermatologist for excision of a chronic skin ulcer on the right arm.  (Tr. 283-84.)

Plaintiff visited Jewish Family Services on November 8, 2010, upon referral from plaintiff's doctor for complaints of panic attacks with agoraphobia and major depressive disorder.  It was noted that plaintiff had a one-year history of worsening symptoms with a history of a depressive episode several years prior. Plaintiff reported having occasional passive suicidal ideation with no active ideation or plan.  No psychosis or mania was reported.

---

[7]Piroxicam is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. Medline Plus (last revised Jan. 1, 2011)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a684045.html>.

Plaintiff was instructed to decrease his dosage of Nortriptyline. Citalopram[8] and Trazodone[9] were prescribed. Plaintiff was referred for counseling. (Tr. 293.)

Plaintiff returned to Jewish Family Services on December 20, 2010, and reported improvement in his panic attacks and agoraphobia, although he reported anxiousness about being at the appointment. Plaintiff reported that he took Citalopram infrequently because it caused undue sedation during the day. Plaintiff reported that Trazodone helped with continuous sleep at night. Plaintiff reported having no feelings of hopelessness or suicidal ideation but reported being discouraged about the slow course of his mental health and back pain issues. Plaintiff reported that he had quit smoking one month prior. Mental status examination showed plaintiff to be cooperative with an "okay" mood and blunted affect. Some psychomotor slowing was noted. Plaintiff was instructed to discontinue Citalopram and to start Bupropion.[10] Plaintiff was instructed to continue with Nortriptyline, Trazodone

---

[8]Citalopram is used to treat depression. Medline Plus (last revised May 15, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html>.

[9]Trazodone is used to treat depression and is sometimes used to treat insomnia, schizophrenia and anxiety. Medline Plus (last revised Aug. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html>.

[10]Bupropion (Wellbutrin) is used to treat depression. Medline Plus (last revised Oct. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695033.html>.

and Baclofen.  It was noted that plaintiff would be referred again for counseling at the next appointment.  (Tr. 292.)

Plaintiff visited Dr. Cass on December 29, 2010, and reported that he did not go to the dermatology appointment.  Dr. Cass noted plaintiff's gait to be normal and that plaintiff was able to get onto the table more easily than in the past.  Physical examination was unremarkable.  Plaintiff was prescribed Piroxicam for his skin ulcer.  It was noted that a biopsy report was needed. Plaintiff reported some dypsnea associated with his COPD.  It was noted that plaintiff recently quit smoking.  Plaintiff was instructed to continue with Nortriptyline and Gabepentin for his neuralgia/neuritis.  (Tr. 281-82.)

On December 30, 2010, plaintiff was informed that the biopsy showed presence of basal cell malignancy at the margin.  Re-excision was necessary.  (Tr. 280.)

On January 20, 2011, plaintiff reported to Jewish Family Services that he had not yet felt the effects of Wellbutrin. Plaintiff reported that Trazodone had been helpful and that he was getting five to six hours of sleep at night with an occasional daytime nap.  Plaintiff reported no change in his panic attacks and reported that he had a panic attack in a store two days prior. Plaintiff reported his energy to be average and denied any active suicidal ideation.  Plaintiff expressed frustration with the uncertainty of his medical diagnoses, noting that a skin biopsy was

recently taken for determination as to cancer. Mental status examination showed some psychomotor slowing. Plaintiff had fair eye contact. Plaintiff's mood was described as "normal" and his affect blunted. Thought process and content were unremarkable. Plaintiff was instructed to continue with Bupropion, Nortriptyline and other medications prescribed by his primary physician. Plaintiff was instructed to increase his dosage of Trazodone. Plaintiff was referred again for counseling. (Tr. 291.)

Plaintiff visited Dr. Darryl T. Zinck at the Family Health Care Center on February 11, 2011. Dr. Zinck noted plaintiff's medical history to show cervical and lumbar sacral disc disease, anxiety, depression, COPD, and basal cell carcinoma on the right forearm. Plaintiff's medications were noted to include Neurontin, Baclofen, Piroxicam, Trazodone, Motrin, Nortriptyline, Bupropion, and Proventil. Plaintiff reported rare wheezing and shortness of breath and that he used Proventil less than once a week. Plaintiff reported frequent muscle spasms occurring several times a week, two or three times a day. Plaintiff reported having inconsistent sleep patterns. With respect to his depression, plaintiff reported that he did not want to leave the house but that he had no suicidal ideation. Dr. Zinck diagnosed plaintiff with depression and instructed plaintiff to increase his Bupropion and to maintain his Trazodone and Nortriptyline at present levels. Plaintiff was also diagnosed with COPD, fairly stable.

Dyslipidemia was also diagnosed. Plaintiff was also diagnosed with cervical and lumbar sacral disease and was instructed to stop taking Piroxicam but to continue with ibuprofen. Finally, plaintiff's history of muscle spasm was noted, for which it was noted that plaintiff took Baclofen. (Tr. 269.)

## V. The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act and would continue to do so through March 31, 2014. The ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability, February 2, 2009. The ALJ found plaintiff's asthma, and degenerative joint disease and degenerative disc disease of the lumbar spine to constitute severe impairments but that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpt. P, App'x 1. The ALJ determined plaintiff to have the RFC to perform light work except for

> being limited to standing/walking six hours in
> an eight hour workday and sitting six hours in
> an eight hour workday. He can never climb
> ladders, ropes or scaffolds. He can
> occasionally climb stairs and ramps, stoop,
> kneel, crouch and crawl. He should avoid
> concentrated exposure to fumes, odors, dust,
> gases, vibration and the hazards of
> unprotected heights.

(Tr. 16.)

Upon consideration of plaintiff's RFC, the ALJ determined plaintiff able to perform his past relevant work as a small products assembler as such work is generally performed. The ALJ thus determined plaintiff not to have been under a disability from February 2, 2009, through the date of the decision. (Tr. 12-20.)

## VI. Discussion

To be eligible for Social Security Disability Insurance Benefits under the Social Security Act, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20

C.F.R. § 404.1520; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. <u>Johnson</u>

v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  Id. (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the plaintiff's impairments.

6.    The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  Coleman, 498 F.3d at 770;

Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

For the following reasons, the ALJ's determination is supported by substantial evidence on the record as a whole, and the Commissioner's final decision should be affirmed.

A.   Severe Mental Impairment

In his written decision, the ALJ determined that plaintiff's "medically determinable mental impairment of depression does not cause more than minimal limitation in [his] ability to perform basic mental work activities and is therefore not severe." (Tr. 14.) Plaintiff claims that the new evidence submitted to and considered by the Appeals Council shows plaintiff's mental impairment to indeed be severe, and thus that the ALJ's determination otherwise is not supported by substantial evidence. Plaintiff claims that, as a result, the ALJ's determination as to

plaintiff's RFC is likewise not supported by substantial evidence inasmuch as it does not take into consideration the effects of plaintiff's severe mental impairment.

All medical records dated August 2010 and beyond, including plaintiff's mental health records obtained from Jewish Family Services, were submitted to and considered by the Appeals Council subsequent to the ALJ's adverse decision in this cause. Because such records were considered by the Appeals Council in its determination whether to review the ALJ's decision, the records are now a part of the administrative record on this judicial review. Davidson v. Astrue, 501 F.3d 989-90 (8th Cir. 2007); Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000). "Where, as here, the Appeals Council considers new evidence but denies review, [the Court] must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence." Davidson, 501 F.3d at 990. To support remand, however, this new evidence must be probative of plaintiff's condition for the time period for which benefits were denied and must not relate to after-acquired conditions or post-decision deterioration of a pre-existing condition. Bergmann v. Apfel, 207 F.3d 1065, 1069-70 (8th Cir. 2000).

The ALJ rendered his written decision in this cause on October 25, 2010. At the time of his decision, the ALJ had before him the testimony adduced at the administrative hearing held on

September 14, 2010, as well as the medical evidence of record up to and including June 30, 2010. At the time of the hearing on September 14, 2010, there was no medical evidence demonstrating that plaintiff suffered from a mental impairment, let alone a severe mental impairment. Instead, all of the medical evidence of record showed that, despite repeated visits to treating and consulting physicians, at no time did plaintiff report or complain of any symptoms associated with a mental impairment. Nor were any such symptoms independently observed. Indeed, a review of the medical evidence shows that, throughout plaintiff's examinations and treatment, mental status examinations were continually unremarkable, plaintiff was noted to be cooperative, and plaintiff was observed not to be anxious. The only evidence before the ALJ relating to any mental impairment consisted of plaintiff's hearing testimony whereby he testified that he cried a couple of times every day for fifteen minutes to half an hour and that he had suicidal thoughts, sometimes on a daily basis, wishing that he would not wake up the following day. Plaintiff does not challenge the ALJ's finding that, on the record before him at the time of his decision, plaintiff did not have a severe mental impairment.

Medical records submitted to the Appeals Council show that on September 30, 2010—subsequent to the administrative hearing on September 14, 2010, but prior to the rendering of the ALJ's written decision on October 25, 2010—plaintiff visited Dr.

Cass and first reported symptoms of anxiety and depression, specifically reporting that he had a rapid heartbeat, was anxious around crowds, avoided people, had frequent crying spells, and suffered from insomnia and suicidal ideation. Plaintiff reported that he had had panic attacks "for years" but that their frequency was increasing. On October 4, 2010, plaintiff reported to Social Worker Hinshaw that he had been depressed and anxious for "quite a while." Plaintiff's first appointment with a mental health professional occurred on November 8, 2010, subsequent to the ALJ's decision, at which time plaintiff reported having symptoms of panic attacks and depression for one year.

New evidence presented to the Appeals Council is relevant only to the extent that it describes a claimant's condition prior to the date of the ALJ's decision. 20 C.F.R. § 404.970(b). Where evidence obtained subsequent to the ALJ's decision is at odds with the evidence before the ALJ, such evidence may reflect only a post-hearing deterioration in a claimant's mental condition, which is beyond the scope of judicial review. Browning v. Sullivan, 958 F.2d 817, 823 (8th Cir. 1992).

Here, medical records show that plaintiff first reported symptoms of a mental impairment on September 30, 2010, but claimed that he had suffered from panic attack symptoms "for years." Likewise, on October 4, 2010, plaintiff reported that he had been depressed and anxious for "quite a while" and isolated himself as

a result.  These belated self reports of extreme, long term mental symptoms are at odds with the evidence before the ALJ that plaintiff repeatedly had unremarkable mental status examinations, was cooperative and was not anxious during the relevant time period.  Indeed, the ALJ in his opinion noted that despite plaintiff's testimony regarding his depressive symptoms, there was no indication that he participated in any counseling or psychotherapy.  (Tr. 18.)  The existence of a severe mental impairment cannot be based solely on a claimant's subjective complaints. <u>Hilkemeyer v. Barnhart</u>, 380 F.3d 441, 445-46 (8th Cir. 2004).  As such, the ALJ's finding that plaintiff did not suffer a severe mental impairment continues to be supported by substantial evidence on the record as a whole inasmuch as, at the time the ALJ rendered his decision, there existed only plaintiff's subjective complaints of mental symptoms with no objective evidence demonstrating that plaintiff suffered a severe mental impairment. <u>Id.</u>

Because new evidence of plaintiff's mental impairment submitted subsequent to the ALJ's decision shows, at most, post-decision deterioration of plaintiff's mental condition, such evidence is not relevant to the determination of the severity of plaintiff's impairment at the time of the ALJ's decision. <u>Browning</u>, 958 F.2d at 823.  Plaintiff is not precluded, however, from proceeding on a subsequent application for Disability

Insurance Benefits for the purpose of determining whether he has become disabled since the ALJ's adverse decision here.  See Hillier v. Social Security Admin., 486 F.3d 359, 365 (8th Cir. 2007).

B.    Physical RFC

Plaintiff claims that the ALJ erred in determining his physical RFC inasmuch as no medical opinion evidence supports the ALJ's finding that plaintiff could perform a limited range of light work.

A claimant's RFC is what he can do despite his limitations.  Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).  The ALJ determines a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations.  Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 404.1545(a).  A claimant's RFC is a medical question, however, and some medical evidence must support the ALJ's RFC determination.  Eichelberger, 390 F.3d at 591; Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001).  The record must contain medical evidence sufficient to determine the claimant's RFC at the time of the hearing.  Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995).  It is the claimant's burden, and not the Commissioner's, to prove his RFC.  Eichelberger, 390 F.3d at 591; Baldwin v. Barnhart, 349 F.3d 549,

556 (8th Cir. 2003); <u>Pearsall</u>, 274 F.3d at 1218.

A review of the ALJ's decision and the relevant evidence of record shows the ALJ to have engaged in the proper analysis as to plaintiff's RFC at the time of his decision. Some medical evidence supports the ALJ's determination, and for the following reasons, such determination is supported by substantial evidence on the record as a whole.

First, with respect to the medical evidence of record, the ALJ noted that July 2009 diagnostic imaging of the cervical spine yielded normal results and that physical examinations conducted throughout 2009 and 2010 showed some tenderness, 4/5 muscle strength and a stiff gait, but were otherwise essentially normal. Despite plaintiff's testimony that diagnostic imaging showed nerve root impingement, the ALJ noted the record not to contain diagnostic testing showing herniation, disc bulging, foraminal or joint space narrowing, nerve root or thecal sac effacement, or any other impingement on the spinal cord; and a review of the record shows Dr. Feldner, a pain specialist, to have opined in January 2010 that any additional imaging would not be very helpful. The ALJ also noted that physical examinations showed no muscular or other neurological deficit, and no muscle atrophy or neuropathy. Indeed, a review of the record shows repeated sensory examinations to be unremarkable. Although the ALJ noted there to be no objective evidence of muscle spasms, the record shows

plaintiff to have repeatedly complained of muscle spasms to his physicians for which he was prescribed medication determined to be effective. The ALJ also noted the medical evidence to show plaintiff's COPD/asthma not to be of a debilitating level. The PFT performed in March 2010 showed only mild obstruction with significant post-dilator response. In addition, plaintiff was prescribed medication for his COPD which plaintiff reported to his physicians that he did not regularly use because he felt his condition was adequately controlled without it. See, e.g., Brown v. Barnhart, 390 F.3d 535, 540-41 (8th Cir. 2004).

With respect to such evidence, plaintiff argues only that, despite the ALJ's purported failure to describe medical evidence to support his RFC finding, there existed medical evidence demonstrating plaintiff's significant limitations, and specifically, the January 2010 examination by Dr. Mannis which showed muscle spasm, decreased range of motion and positive straight leg raising. As noted by the ALJ, however, Dr. Mannis observed during his examination that plaintiff's complaints were disproportionate to the lack of objective clinical findings. (Tr. 17-18.) In addition, Dr. Mannis also observed that plaintiff exhibited only fair effort during the range of motion exam. Cf. Baker v. Barnhart, 457 F.3d 882, 892 (8th Cir. 2006) (plaintiff's subjective complaints not credible when there is indication that plaintiff exaggerated symptoms and gave less than full effort

during functional capacity evaluation).

The ALJ also discussed the non-medical evidence of record, noting specifically plaintiff's testimony that he could continue to work at his job if it had not been eliminated and also that plaintiff applied for and received unemployment benefits until one month prior to the administrative hearing.  <u>See</u>, <u>e.g.</u>, <u>Goff</u>, 421 F.3d at 793 (significant that claimant left job for reasons other than impairment; <u>Barrett v. Shalala</u>, 38 F.3d 1019, 1024 (8th Cir. 1994) (statement required for unemployment benefits that claimant is capable of working and seeking work is "clearly inconsistent" with claim of disability during same period).  The ALJ also noted the record not to show that plaintiff's medications were not efficacious when taken as prescribed and that there was no objective evidence of adverse side effects.  <u>See</u>, <u>e.g.</u>, <u>Schultz v. Astrue</u>, 479 F.3d 979, 983 (8th Cir. 2007) (if impairment can be controlled by treatment or medication, is cannot be considered disabling).  Finally, the ALJ considered plaintiff's Function Report, completed in December 2009, wherein plaintiff reported that he lives with his family, takes care of his mother, has no problems taking care of his personal needs, prepares daily meals, does the laundry, does light housework, mows the lawn, drives, rides in a car, shops for groceries, watches television, talks on the telephone, visits with others, listens to music, and barbeques (<u>see</u> Tr. 144-51), and found such activities to be incompatible with

debilitating symptoms precluding work. (Tr. 18.) See, e.g., Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009) (activities such as cooking, doing laundry, grocery shopping, driving, and mowing lawn are inconsistent with complaints of disabling pain).

Finally, the ALJ noted that no treating or examining physician opined that plaintiff had any debilitating limitations on his ability to work. See, e.g., Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2004) (medical professionals did not indicate that plaintiff was precluded from performing any work). Indeed, the record shows plaintiff's treating physician to repeatedly advise plaintiff to engage in more activity and, on one occasion, encouraged plaintiff to participate in vocational rehabilitation. Such instruction indicates a belief that plaintiff is capable of engaging in work activities. Cf. Maddox v. Massanari, 199 F. Supp. 2d 928, 941 (E.D. Mo. 2001). Although plaintiff argues that the record lacked *opinion* evidence upon which the ALJ could made an RFC determination, the mere lack of opinion evidence in itself is not a sufficient basis upon which to find an ALJ's decision not to be supported by substantial evidence where, as here, the record includes evidence from a treating physician or an examining physician addressing a claimant's particular impairments at issue. Strongson v. Barnhart, 361 F.3d 1066, 1071-72 (8th Cir. 2004). In this case, as discussed above, there was substantial evidence in the record from treating and examining physicians from which the

ALJ could determine the extent to which plaintiff's functional abilities were affected by his impairments. As such, the failure of the ALJ to seek and/or rely on *opinion* evidence to determine plaintiff's RFC was not error.

Upon conclusion of his discussion of specific medical facts, non-medical evidence, and the consistency of such evidence when viewed in light of the record as a whole, the ALJ assessed plaintiff's RFC and specifically set out plaintiff's limitations and the maximum amount of each work-related activity plaintiff could perform based on the evidence available in the case record. Plaintiff presents no evidence or argument demonstrating that he was more restricted than as determined by the ALJ. An ALJ is not required to disprove every possible impairment. McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011). Because some medical evidence supports the ALJ's RFC determination, it must stand. See Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008); SSR 96-8p, 1996 WL 374184, at *7 (Soc. Sec. Admin. July 2, 1996). Although not all the medical evidence "pointed in that direction," there nevertheless was a sufficient amount that did. See Moad v. Massanari, 260 F.3d 887, 891 (8th Cir. 2001). Because substantial evidence supports the ALJ's determination, it must be upheld, even if the record could also support an opposite decision. Weikert, 977 F.2d at 1252.

To the extent plaintiff argues that the ALJ's flawed RFC

analysis resulted in a flawed hypothetical being posed to the vocational expert, the undersigned notes that the ALJ in this cause determined at step four of the sequential analysis that plaintiff could perform his past relevant work. "[I]t is clear in [the Eighth] [C]ircuit that vocational expert testimony is not required at step four where the claimant retains the burden of proving [he] cannot perform [his] prior work." Banks v. Massanari, 258 F.3d 820, 827 (8th Cir. 2001). Nevertheless, because the ALJ did not err in his RFC determination, plaintiff's contention that the flawed RFC analysis resulted in a flawed hypothetical is without merit and should be denied.

C.   Function-by-Function Analysis of Past Relevant Work

At step four of the sequential analysis in determining disability, an ALJ compares a claimant's RFC "with the physical and mental demands of [the claimant's] past relevant work." 20 C.F.R. § 404.1520(f). If the ALJ determines the claimant can perform his past relevant work, the claimant is not disabled. See id. In making this determination, the ALJ must fully investigate and make explicit findings as to the physical and mental demands of the claimant's past relevant work and compare that with what the claimant is capable of doing. Young v. Astrue, 702 F.3d 489, 491 (8th Cir. 2013); Nimick v. Secretary of Health & Human Servs., 887 F.2d 864, 866 (8th Cir. 1989). See also Groeper v. Sullivan, 932 F.2d 1234, 1238-39 (8th Cir. 1991). Plaintiff contends here that

the ALJ made only a conclusory statement that plaintiff could perform his past relevant work and failed to undergo the required function-by-function analysis as shown by his failure to discuss how plaintiff's mental limitations affected his RFC to perform the mental demands of his past work.

As discussed <u>supra</u> at Section VI.A, the ALJ did not find plaintiff to have a severe mental impairment and such decision is supported by substantial evidence on the record as a whole, even when viewed in consideration of the subsequent evidence submitted to the Appeals Council. Where an ALJ does not find a severe mental impairment, he does not err in failing to examine the mental demands of a claimant's past relevant work inasmuch as he has already determined that the claimant is not significantly affected by any mental limitations. <u>Rose v. Apfel</u>, 181 F.3d 943, 945 (8th Cir. 1999). Accordingly, given plaintiff's lack of a severe mental impairment at the time of the ALJ's decision here, the ALJ's failure to examine the mental demands of plaintiff's past relevant work was not error.

An ALJ satisfies his duty to examine the specific demands of a claimant's past relevant work by referring to the job descriptions in the DOT that are associated with the claimant's past relevant work. <u>Young</u>, 702 F.3d at 491-92. Here, the ALJ expressly referred to the DOT in his decision, noting that the vocational expert's testimony regarding the work of a small

products assembler was consistent with the DOT. (Tr. 19.) Indeed, a review of the administrative hearing shows the vocational expert to have testified that the RFC contained within the hypothetical posed by the ALJ was consistent with what was required for work performed by a small products assembler as set out in the DOT. (Tr. 39.) A small products assembler, as defined by the DOT, is performed at the light exertional level. See DOT No. 706.684-022, Assembler, Small Products I; DOT No. 739.687-030, Assembler, Small Products II.

Here, the ALJ described plaintiff's RFC in specific terms and concluded that, with such an RFC, plaintiff could perform his past relevant work as a small products assembler as that work is described in the DOT and supported by consistent vocational expert testimony. The ALJ reached this decision only after giving consideration to plaintiff's medically determinable impairments which give rise to plaintiff's pain and other symptoms; the intensity, persistence and limiting effects of such symptoms to determine the extent to which plaintiff's functioning is limited thereby; and credibility factors, including the duration and intensity of any pain, precipitating and aggravating factors, medications and other treatment, functional restrictions, and plaintiff's daily activities. (Tr. 16-17.) The ALJ also noted plaintiff's testimony that he could probably perform his past work if the job continued to exist. Finally, as discussed supra at

Section VI.B, the ALJ's discussion as to plaintiff's ability to perform work considered the medical and non-medical evidence of record, including the observations of treating and examining physicians. Although the ALJ did not engage in a specific function-by-function discussion of the specific demands of plaintiff's past relevant work nor specifically compare plaintiff's physical abilities to perform specific demands, the ALJ's express reliance on the DOT and his detailed determination as to plaintiff's RFC was adequate to support his finding that plaintiff had the RFC to perform his past relevant work. See Young, 702 F.3d at 492. An arguable deficiency in opinion-writing technique does not require reversal of an ALJ's decision if such deficiency had no bearing on the outcome of the proceeding. Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008); Strongson, 361 F.3d at 1072.

## VII.  Conclusion

For the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ's determination is supported by substantial evidence on the record as a whole and plaintiff's claims of error should be denied. Inasmuch as there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Browning, 958 F.2d at

821. Accordingly, because there is substantial evidence on the record as a whole to support the ALJ's decision, the Commissioner's determination that plaintiff is not disabled through the date of the ALJ's decision should be affirmed.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed and that plaintiff's Complaint be dismissed with prejudice.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than **March 8, 2013.** Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of February, 2013.